Denis W. Stearns, Wis. Bar No. 1020675
William D. Marler, application pending
MARLER CLARK, L.L.P., P.S.
1012 First Avenue, Fifth Floor
Seattle, WA 98104
Telephone: (206) 346-1888
Facsimile: (206) 346-1898
Email: dstearns@marlerclark.com

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN
## MADISON DIVISION

| | |
|---|---|
| Austin Weber, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| Fred Meyer, Inc. d/b/a Fred Meyer; The Kroger Company; KeHE Distributors, LLC; KeHE Distributors, Inc.; KeHE Enterprises, LLC; World Finer Foods, Inc.; and World Finer Foods, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMES NOW the Plaintiff, Austin Weber, by and through his attorneys of record, Denis W. Stearns, of Stearns Law PLLC, and the law firm of Marler Clark, LLP, PS, complaining of the Defendants, Fred Meyer, Inc., d/b/a Fred Meyer, The Kroger Company, KeHE Distributors, LLC, KeHE Distributors, Inc., KeHE Enterprises, LLC, World Finer Foods, Inc., and World Finer Foods, LLC, and by this Complaint alleges and states as follows:

## PARTIES

1. At all times relevant to this action, the Plaintiff resided in Dane County, Wisconsin. The Plaintiff is therefore a citizen of the State of Wisconsin.

2. At all times relevant to this action, the Defendant Fred Meyer Inc. ("Fred Meyer")

1

was a Delaware corporation with its principal place of business located in Portland, Oregon. Fred Meyer is therefore a citizen of the States of Delaware and Oregon. At all times relevant to this action, Fred Meyer owned and operated the Fred Meyer retail store located at 61535 South Highway 97 in Bend, Oregon.

3. At all times relevant to this action, Defendant Kroger Company ("Kroger") was an Ohio corporation with its principal place of business located in Cincinnati, Ohio. Kroger is therefore a citizen of the State of Ohio. At all times relevant to this action, Fred Meyer Inc. was a subsidiary of Kroger, which does business throughout the United States, including Wisconsin.

4. At all times relevant to this action, Defendant KeHE Distributors, LLC, formed under the laws of the State of Delaware, but with its principal place of business in Naperville, Illinois. On information and belief, KeHE's only member is Brandon Barnholt, who resides in Naperville, Illinois. Therefore, KeHE Distributors, LLC and all of its members are citizens of the States of Illinois. KeHE Distributors, LLC does business in the State of Wisconsin, based on its continuous and systematic affiliations there, and purposely availing itself of Wisconsin law.

5. At all times relevant to this action, Defendant KeHE Distributors, Inc., was a Delaware corporation with its principal place of business in Naperville, Illinois. Therefore, KeHE Distributors, Inc. is a citizen of the State of Illinois. KeHE Distributors, Inc. does business in the State of Wisconsin, based on continuous and systematic affiliations there, and purposely availing itself of the protections and benefits of Wisconsin law.

6. At all times relevant to this action, Defendant KeHE Enterprises, LLC, was a Delaware corporation with its principal place of business in Naperville, Illinois. Therefore, KeHE Enterprises, LLC is a citizen of the State of Illinois. Based upon information and belief, KeHE Enterprises, LLC does business throughout the United States, including the State of Wisconsin, by and through its related and/or alter-ego companies, including KeHE Distributors Inc. and LLC.

7. At all times relevant to this action, Defendant World Finer Foods, Inc. was a

Delaware corporation with its principal place of business located in Bloomfield, New Jersey. World Finer Foods, Inc. is therefore a citizen of the State of New Jersey. Based upon information and belief, World Finer Foods, Inc. does business throughout the United States, including the State of Wisconsin, given that the subject product its sold and distributed was sold and distributed there.

8. At all times relevant to this action, Defendant World Finer Foods, LLC was a Delaware corporation with its principal place of business in Catonsville, Maryland. World Finer Foods, LLC is therefore a citizen of the States of Delaware and Maryland. Based upon information and belief, World Finer Foods, Inc. does business throughout the United States, including the State of Wisconsin, given that the subject product its sold and distributed was sold and distributed there.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, and it is between citizens of different states—*i.e.*, with the Plaintiff being a citizen of Wisconsin, but no defendants as citizens of this same state. This Court also has jurisdiction over the Defendants based on allegations that all of the Defendants do business in Wisconsin, maintaing sufficient minimum contacts with the State, through and based its continuous and systematic affiliations there, and y purposely availing itself of the protections and benefits of Wisconsin law such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

10. Venue in the Western District of Wisconsin is proper pursuant to 28 USC § 1391(a)(1) and (2) because the Defendants are subject to personal jurisdiction in this judicial district.

## FACTS

**The Outbreak**

11. In March 2017, the Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC), along with state and local health officials, attributed a multi-state outbreak of Shiga toxin-producing *Escherichia coli* O157:H7 to I.M. Healthy brand SoyNut Butter.

12. Epidemiologic investigation by federal, state, and local public health officials, including Centers for Disease Control and Prevention (CDC) and Food and Drug Administration (FDA), found that at least 32 people had acquired *E. coli* O157:H7 infections by consuming contaminated I.M. Healthy SoyNut Butter. This included residents of Arizona (4), California (5), Florida (2), Illinois (1), Massachusetts (1), Maryland (1), Missouri (1), New Jersey (1), Oregon (11), Virginia (2), Washington (2), and Wisconsin (1). Twelve individuals were hospitalized due to their infection, and nine developed hemolytic uremic syndrome (HUS).

13. The I.M. Healthy brand of soy nut butter products identified as the contaminated food item in this outbreak were produced jointly by The SoyNut Butter Company and Dixie Dew Products, Inc., at a facility owned by Dixie Dew in Kentucky. On March 28, 2017, once the epidemiologic investigation described previously had identified I.M. Healthy brand soy nut butter products as the source of the outbreak, the Food and Drug Administration (FDA) conducted a comprehensive investigation at the Dixie Dew facility. Among other things, the FDA found:

    a. grossly insanitary conditions;

    b. food contact surfaces, floors, walls, and ceilings in the soy nut butter processing and packaging rooms were heavily coated with soy nut butter build-up from previous production runs;

    c. that Dixie Dew does not routinely wash and sanitize smaller pipes, pipe fittings, gaskets, seals, "or the rubber _____ plug" when broken down following a production run;

    d. that Dixie Dew does not conduct a kill step for SoyNut Butter product remaining in its mixing kettle leftover from a production run;

    e. that certain equipment in the facility routinely shuts off during processing— approximately one to two times per day—and that the problem has persisted for approximately 15 years despite repeated maintenance intended to correct the problem;

    f. that a thermometer used during the production of the subject product has never been verified for accuracy;

    g. that a temperature probe and chart recorder used during the production process for the subject product does not function properly and has not been used

for well over a year;

h.  that Dixie Dew's food safety testing program is problematic—among other things, due to the failure to perform microbial testing where necessary to identify possible food contamination;

i.  that FDA inspectors found that testing materials on hand at Dixie Dew had expired in July 2016 and October 2015

j.  that Dixie Dew had a fly infestation problem, and that small apparent flies and fly larvae, too numerous to count, were inside an unplugged chest freezer;

14. On March 4, 2017, as a result of epidemiologic and environmental evidence indicating that its soy nut butter products were the source of the outbreak, The SoyNut Butter Company recalled I.M. Healthy Original Creamy Soy Nut Butter with "best by" dates July 5, August 30, and August 31, 2018. This recall also included individual portion cups of the same product with best by dates in July, August, and November 2018.

15. On March 7, 2017, The SoyNut Butter Company expanded its recall to include all varieties of I.M. Healthy soy nut butters and all varieties of I.M. Healthy granola products, regardless of production or best by date.

16. The Plaintiff was one of multiple individuals to make a claim for personal injuries against The SoyNut Butter Company and Dixie Dew as a result of this outbreak. Both companies filed for Chapter 7 bankruptcy, and the assets of these companies available to satisfy personal injury claims arising from this outbreak, including Plaintiff's, were insufficient to fairly compensate the claimants.

17. At all times relevant to this action, Defendants KeHE Distributors, LLC, KeHE Distributors, Inc., and KeHE Enterprises, LLC were all alter egos of one another and are referred to collectively as "Defendant Kehe" in this complaint. These entities jointly or independently distributed I.M. Healthy SoyNut Butter. On information and belief, Brandon Barnholt is a primary member and officer of all of these entities. There thus exists a unity of interest and ownership between these related entities, the exact relationship of which is not fully known by Plaintiff, and all are liable in this action.

18. At all times relevant to this action, Defendants World Finer Foods, Inc. and World

5

Finer Foods, LLC were alter egos of one another and are referred to collectively as "Defendant World Finer" in this complaint. These entities jointly or independently distributed I.M. Healthy SoyNut Butter. On information and belief, Brandon Barnholt is a primary member and officer of all of these entities. There thus exists a unity of interest and ownership between these related entities, the exact relationship of which is not fully known by Plaintiff, and both are liable in this action.

19. Defendants Kehe and World Finer are distributors of various food products to retail stores and foodservice locations nationally. Defendants Kehe and World Finer each acquired and distributed recalled soy nut butter products, including to Fred Meyer and other retail stores nationally.

20. With regard to the contaminated jar of I.M. Healthy Soy Nut Butter that Plaintiff purchased at Fred Meyer, as described below, World Finer acquired this product from The SoyNut Butter Company and distributed it to Kehe. Kehe then distributed the product to the Fred Meyer store location where the soy nut butter product in this case was purchased.

## *E. coli* **O157:H7**

21. *E. coli* is an archetypal commensal bacterial species that lives in mammalian intestines. *E. coli* O157:H7 is one of thousands of serotypes *Escherichia coli*. The combination of letters and numbers in the name of the *E. coli* O157:H7 refers to the specific antigens (proteins which provoke an antibody response) found on the body and tail or flagellum respectively and distinguish it from other types of *E. coli*. Most serotypes of *E. coli* are harmless and live as normal flora in the intestines of healthy humans and animals. The *E. coli* bacterium is among the most extensively studied microorganism. The testing done to distinguish *E. coli* O157:H7 from its other *E. coli* counterparts is called serotyping. Pulsed-field gel electrophoresis (PFGE), sometimes also referred to as genetic fingerprinting, is used to compare *E. coli* O157:H7 isolates to determine if the strains are distinguishable. A technique called multilocus variable-number tandem repeat analysis (MLVA) is used to determine precise classification when it is difficult to differentiate between isolates with

6

indistinguishable or very similar PFGE patterns.

22. *E. coli* O157:H7 was first recognized as a pathogen in 1982 during an investigation into an outbreak of hemorrhagic colitis associated with consumption of hamburgers from a fast food chain restaurant. Retrospective examination of more than three thousand *E. coli* cultures obtained between 1973 and 1982 found only one (1) isolation with serotype O157:H7, and that was a case in 1975. In the ten (10) years that followed there were approximately thirty (30) outbreaks recorded in the United States. This number is likely misleading, however, because *E. coli* O157:H7 infections did not become a reportable disease in any state until 1987 when Washington became the first state to mandate its reporting to public health authorities. As a result, only the most geographically concentrated outbreak would have garnered enough notice to prompt further investigation.

23. *E. coli* O157:H7's ability to induce injury in humans is a result of its ability to produce numerous virulence factors, most notably Shiga-like toxins. Shiga toxin (Stx) has multiple variants (e.g. Stx1, Stx2, Stx2c), and acts like the plant toxin ricin by inhibiting protein synthesis in endothelial and other cells. Shiga toxin is one of the most potent toxins known. In addition to Shiga toxins, *E. coli* O157:H7 produces numerous other putative virulence factors including proteins, which aid in the attachment and colonization of the bacteria in the intestinal wall and which can lyse red blood cells and liberate iron to help support *E. coli* metabolism.

24. *E. coli* O157:H7 evolved from enteropathogenic *E. coli* serotype O55:H7, a cause of non-bloody diarrhea, through the sequential acquisition of phage-encoded Stx2, a large virulence plasmid, and additional chromosomal mutations. The rate of genetic mutation of *E. coli* O157:H7 indicates that the common ancestor of current *E. coli* O157:H7 clades likely existed some 20,000 years ago. *E. coli* O157:H7 is a relentlessly evolving organism, constantly mutating and acquiring new characteristics, including virulence factors that make the emergence of more dangerous variants a constant threat. The CDC has emphasized the prospect of emerging pathogens as a significant public health threat for some time.

7

25.     Although foods of a bovine origin are the most common cause of both outbreaks and sporadic cases of *E. coli* O157:H7 infections, outbreak of illnesses have been linked to a wide variety of food items. For example, produce has, since at least 1991, been the source of substantial numbers of outbreak-related *E. coli* O157:H7 infections. Other unusual vehicles for *E. coli* O157:H7 outbreaks have included unpasteurized juices, yogurt, dried salami, mayonnaise, raw milk, game meats, sprouts, and raw cookie dough.

26.     According to a recent study, an estimated 93,094 illnesses are due to domestically acquired *E. coli* O157:H7 each year in the United States. Estimates of foodborne acquired O157:H7 cases result in 2,138 hospitalizations and 20 deaths annually. The colitis caused by *E. coli* O157:H7 is characterized by severe abdominal cramps, diarrhea that typically turns bloody within twenty-four (24) hours, and sometimes fevers. The incubation period—which is to say the time from exposure to the onset of symptoms—in outbreaks is usually reported as three (3) to four (4) days but may be as short as one (1) day or as long as ten (10) days. Infection can occur in people of all ages but is most common in children. The duration of an uncomplicated illness can range from one (1) to twelve (12) days. In reported outbreaks, the rate of death is 0-2%, with rates running as high as 16-35% in outbreaks involving the elderly, like those that have occurred at nursing homes.

27.     What makes *E. coli* O157:H7 remarkably dangerous is its very low infectious dose, and how relatively difficult it is to kill these bacteria. Unlike *Salmonella*, for example, which usually requires something approximating an "egregious food handling error, *E. coli* O157:H7 in ground beef that is only slightly undercooked can result in infection," as few as twenty (20) organisms may be sufficient to infect a person and, as a result, possibly kill them. And unlike generic *E. coli*, the O157:H7 serotype multiplies at temperatures up to 44°F, survives freezing and thawing, is heat resistant, grows at temperatures up to 111°F, resists drying, and can survive exposure to acidic environments.

28.     And, finally, to make it even more of a threat, *E. coli* O157:H7 bacteria are easily

transmitted by person-to-person contact. There is also the serious risk of cross-contamination between raw meat and other food items intended to be eaten without cooking. Indeed, a principle and consistent criticism of the USDA *E. coli* O157:H7 policy is the fact that it has failed to focus on the risks of cross-contamination versus that posed by so-called improper cooking. With this pathogen, there is ultimately no margin of error. It is for this precise reason that the USDA has repeatedly rejected calls from the meat industry to hold consumers primarily responsible for *E. coli* O157:H7 infections caused, in part, by mistakes in food handling or cooking.

**Hemolytic Uremic Syndrome (HUS)**

29.     *E. coli* O157:H7 infections can lead to a severe, life-threatening complication called hemolytic uremic syndrome ("HUS"). HUS accounts for the majority of the acute and chronic illness and death caused by the bacteria. HUS occurs in 2-7% of victims, primarily children, with onset five to ten days after diarrhea begins. It is the most common cause of renal failure in children. Approximately half of the children who suffer HUS require dialysis, and at least 5% of those who survive have long-term renal impairment. The same number suffers severe brain damage. While somewhat rare, serious injury to the pancreas, resulting in death or the development of diabetes, can also occur. There is no cure or effective treatment for HUS. And, tragically, as too many parents can attest, children with HUS too often die.

30.     HUS is believed to develop when the toxin from the bacteria, known as Shiga-like toxin (SLT), enters the circulation through the inflamed bowel wall. SLT, and most likely other chemical mediators, attach to receptors on the inside surface of blood vessel cells (endothelial cells) and initiate a chemical cascade that results in the formation of tiny thrombi (blood clots) within these vessels. Some organs seem more susceptible, perhaps due to the presence of increased numbers of receptors, and include the kidney, pancreas, and brain. By definition, when fully expressed, HUS presents with the triad of hemolytic anemia (destruction of red blood cells), thrombocytopenia (low platelet count), and renal failure (loss of kidney function).

31.     As already noted, there is no known therapy to halt the progression of HUS. HUS is a frightening complication that, even in the best American centers, has a notable mortality rate. Among survivors, at least five percent will suffer end stage renal disease (ESRD) with the resultant need for dialysis or transplantation. But "[b]ecause renal failure can progress slowly over decades, the eventual incidence of ESRD cannot yet be determined." Other long-term problems include the risk for hypertension, proteinuria (abnormal amounts of protein in the urine that can portend a decline in renal function), and reduced kidney filtration rate. Other long-term problems include the risk for hypertension, proteinuria (abnormal amounts of protein in the urine that can portend a decline in renal function), and reduced kidney filtration rate. Since the longest available follow-up studies of HUS victims are 25 years, an accurate lifetime prognosis is not really available and remains controversial. All that can be said for certain is that HUS causes permanent injury, including loss of kidney function, and it requires a lifetime of close medical monitoring.

**The Plaintiff's *E. coli* O157:H7 Infection**

32.     Although he is a resident of Wisconsin, Mr. Weber participated in the New Vision Wilderness Program in Bend, Oregon from October 2016 to January 2017. All food for attendees was purchased and provided by New Vision.

33.     During the program, Mr. Weber was in the wilderness for approximately two months, where he consumed I.M. Healthy Soynut Butter from several different jars of product that New Vision staff had purchased at the Fred Meyer located at 61535 South Highway 97 in Bend, Oregon.

34.     On January 7, 2017, Mr. Weber developed severe abdominal cramping and bloody diarrhea.

35.     On January 8, 2017, Mr. Weber was taken to St. Charles Medical Center in Bend, Oregon for medical attention.

36.     A stool sample collected at the hospital tested positive for *E. coli* O157. Mr. Weber was admitted to the hospital on January 9 and remained hospitalized until January 14, 2017.

37. Mr. Weber's hospitalization caused him severe anxiety and he continued to experience stomach pain and have episodes of diarrhea throughout 2017.

38. Mr. Weber was diagnosed with kidney stones on March 8, 2018. He again sought medical care on the May 11 and May 13, 2018 for the same.

## COUNT I
### (Strict Products Liability)

39. The Plaintiff incorporates the preceding paragraphs of this Complaint, by this reference, as if each of these paragraphs were set forth here in its entirety.

40. The Defendants distributed and sold the contaminated I.M. Healthy SoyNut Butter product that New Vision staff purchased from the Fred Meyer located at 61535 South Highway 97 in Bend, Oregon, which caused Plaintiff's illness and injuries. This product will hereafter be called the "subject product."

41. The Defendants, and each of them, regularly purchased, distributed, and sold I.M. Healthy SoyNut Butter products. The Defendants, and each of them, purchased, distributed, and sold the subject product.

42. Food that is contaminated by *E. coli* O157:H7 is unsafe when put to its reasonably foreseeable use considering the nature of the product. Namely, *E. coli* O157:H7 contaminated food is unfit for human consumption.

43. The subject product was contaminated by *E. coli* O157:H7 when it left the control of the Defendants and was, as a result, defective and not reasonably safe. The Plaintiff's consumption of the contaminated food caused him to become infected by *E. coli* O157:H7 and to suffer injuries as a direct and proximate result of that consumption.

44. The Defendants are strictly liable to the Plaintiff for the harm proximately caused by the distribution and sale of an unsafe and defective food product.

11

## COUNT II
## (Negligence and Negligence Per Se)

45. The Plaintiff incorporates by reference and makes a part of this Count each and every foregoing paragraph of this Complaint.

46. The Defendants had a duty to comply with all statutory and regulatory provisions that pertained or applied to the distribution, storage, and sale of the food products that injured the Plaintiff, including the applicable provisions of the Federal Food, Drug and Cosmetic Act, and similar and applicable state laws, including, but not limited to, Wisconsin food and public health statutes that prohibit the sale of any food that is adulterated or otherwise injurious to health.

47. The subject product was adulterated within the meaning of the Federal Food, Drug and Cosmetic Act, and similar Wisconsin statutes and regulations, because it contained a deleterious substance that rendered it injurious to health, i.e., *E. coli* O157:H7 bacteria.

48. The Defendants violated federal, state, and local food safety regulations by their sale of adulterated food. These federal, state, and local food safety regulations are applicable here, and establish a positive and definite standard of care in the sale of food. The violation of these regulations constitutes negligence as a matter of law.

49. The Plaintiff is in the class of persons intended to be protected by these statutes and regulations, and the Plaintiff was injured as the direct and proximate result of the Defendants' violation of applicable federal, state, and local food safety regulations.

50. The Defendants were negligent in the distribution and sale of a food product that was adulterated with *E. coli* O157:H7, not fit for human consumption, and not reasonably safe because adequate warnings or instructions were not provided.

51. The Defendants had a duty to sell food products that were from reliable sources and that were clean, wholesome, free from adulteration and fit for human consumption, but failed to do so, and therefore breached that duty.

52. The Defendants were negligent in the selection of suppliers, or other agents or subcontractors, and failed to adequately supervise them, or provide them with adequate standards, and, as a result, sold food that was adulterated with *E. coli* O157:H7.

53. The Defendants' various acts and omissions of negligence proximately caused Plaintiff's *E. coli* O157:H7 infection and related illness, injuries, and damages.

## COUNT III
### (Breach of Express and Implied Warranties)

54. The Plaintiff incorporates the preceding paragraphs of this Complaint, by this reference, as if each of these paragraphs were set forth here in its entirety.

55. By distributing and selling the subect product for sale to the public and for consumption, Defendants impliedly warranted that such products were safe to eat, that they were not adulterated with a deadly pathogen, and that the products had been safely prepared under sanitary conditions that complied with all applicable laws.

56. The Defendants breached these implied warranties by distributing and selling the subject product, because it was contaminated by *E. coli* O157:H7.

57. Further, the label of I.M. Healthy soy nut butter promises that consumers will be "Healthy" if they purchase and consume the soy nut butter, and the defendants adopted such expression as their own by the sale and distribution of the subject product as so-labeled.

58. By expressly assuring the Plaintiff in writing that the I.M. Healthy soy nut butter was healthy and that it was a "natural product," Defendants expressly warranted that the food that they sold, distributed and supplied was fit for Plaintiff's safe and healthy consumption.

59. Defendants breached their express warranty as described above in that the food that they sold, distributed and supplied was not fit for Plaintiff's consumption.

60. The Plaintiff's injuries proximately and directly resulted from the Defendants' breach of express and implied warranties, and the Plaintiff is thus entitled to recover for all actual,

consequential, and incidental damages that flow directly and in a foreseeable fashion from these breaches.

## DAMAGES

61.     For purposes of pleading damages, the Plaintiff incorporates all of the above-stated allegations as if fully set forth here.

62.     The Plaintiff suffered general, special, incidental, and consequential damages as a direct and proximate result of the acts and omissions of the Defendants, as set forth above, in an amount that shall be fully proven at the time of trial. Such damages include, but are not limited to: past and future damages for pain and suffering, loss of enjoyment of life, mental distress, and fear of future illness and death; past and future medical expenses and other costs or related out-of-pocket expenses; and any other damages that are reasonably anticipated to arise under the circumstances.

## JURY DEMAND

The Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against the Defendants as follows:

A.     Ordering compensation for all general, special, incidental, and consequential damages suffered by the Plaintiff as a result of the Defendants' conduct;

B.     Awarding Plaintiff his reasonable attorneys fees and costs, to the fullest extent allowed by law; and

C.     Granting all such additional or further relief as this Court deems just and equitable

under the circumstances.

Respectfully submitted,

\s\ Denis Stearns
Denis Stearns, Wis. Bar No. 1020675
MARLER CLARK, LLP, PS
1012 First Ave., 5th Floor
Seattle, WA  98104-1008
Telephone: (206) 346-1888
Facsimile: (206) 346-1898
E-mail:  dstearns@marlerclark.com

William D. Marler, WSBA #17233
MARLER CLARK, LLP, PS
1012 First Ave., 5th Floor
Seattle, WA  98104-1008
Telephone: (206) 346-1888
Facsimile: (206) 346-1898
E-mail:  bmarler@marlerclark.com
(Pending admission *pro hac vice*)

Attorneys for Plaintiff